# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

FLEMING, COOPER, and SCHLACK
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist RAYMOND A. PRICE**
**United States Army, Appellant**

ARMY 20220347

Headquarters, Eighth Army
Christopher E. Martin, Military Judge (arraignment and motions)
Matthew S. Fitzgerald, Military Judge (trial)
Colonel Rebecca K. Connally, Staff Judge Advocate

For Appellant: William E. Cassara, Esquire (argued); Captain Kevin T. Todorow, JA; William E. Cassara, Esquire (on brief and reply brief).

For Appellee: Major Patrick S. Barr, JA (argued); Colonel Christopher B. Burgess, JA; Colonel Jacqueline J. DeGaine, JA; Lieutenant Colonel Kalin P. Schlueter, JA; Captain Patrick S. Barr, JA (on brief).

20 May 2025

-----------------------------------
MEMORANDUM OPINION
-----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Senior Judge:

An enlisted panel convicted appellant, contrary to his pleas, of four specifications of assault consummated by a battery, two specifications of battery upon an intimate partner, and one specification of assault with an unloaded firearm, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 (2019) [UCMJ].[1] The panel sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to

---

[1] The panel found appellant not guilty of one specification of aggravated assault with a dangerous weapon, one specification of aggravated assault by strangulation, three specifications of battery upon an intimate partner, and one specification of extramarital sexual conduct, in violation of Articles 128 and 134, UCMJ.

the grade of E-1. Appellant raises four assignments of error, two of which merit discussion but no relief.[2]

## BACKGROUND

The misconduct giving rise to appellant's court-martial stems from two marriages, first to ▮ and then to ▮

Appellant and ▮ were married in February 2017. In May 2017, they began to live together. Within a week of cohabitating, appellant allegedly strangled and slapped ▮ Appellant was acquitted of this offense but found guilty of every other charged assault involving ▮ as detailed below.

In September 2017, appellant assaulted ▮ hitting her face and punching her thigh. Later, in February 2018, appellant punched ▮'s face after getting upset with ▮ over the cost of boarding their dog while the couple attended a marriage retreat. Another altercation occurred in May 2018, when appellant backhanded ▮ in the nose, causing it to bleed. After ▮ left the room, appellant followed. Appellant then punched ▮ in her face and pointed a firearm at her head, stating he wanted to kill her as she was cowering on the floor.

In July 2018, ▮ informed appellant she wanted a divorce. Their divorce was finalized in November 2018. ▮ reported appellant's offenses in January 2020, after she entered onto active duty.

Appellant and his second wife, ▮ wed ten days after his divorce from ▮. In February 2019, ▮ moved to the Republic of Korea (ROK) where appellant was stationed. In April 2019, appellant allegedly grabbed ▮'s ear due to her poor performance in a video game the couple was playing. The abuse continued the following month when appellant struck ▮ in the face with his hand. In June or July 2019, appellant grabbed ▮'s hair as she tried to leave their bedroom and allegedly sprayed her in the eyes with Febreeze. In July or August 2019, appellant allegedly kneed ▮'s stomach, when she was approximately four months pregnant, because ▮ had "pissed him off." ▮ then reported her allegations regarding appellant to law enforcement and she left the ROK.

Appellant was found not guilty of pulling ▮'s ear (April 2019), spraying air freshener into her eyes (June to July 2019), and kneeing ▮ (July to August 2019).

---

[2] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and determine only one, whether his convictions of Specifications 2 and 3 of Charge I violate the Double Jeopardy clause prohibition against multiplicity, merits discussion and relief.

He was found guilty of striking her face with his hand (May 2019) and pulling her hair (June to July 2019).

The military judge who presided over appellant's arraignment, motions hearing, and issued rulings related to the motions hearing, departed the ROK for another assignment prior to appellant's contested trial. Subsequently, a military judge from Joint Base Lewis-McChord in Washington state was assigned to appellant's case. The military judge traveled in a temporary duty status to the ROK to preside over appellant's contested trial.

## LAW AND DISCUSSION

### A. Impartiality of the Military Judge

For the first time on appeal, appellant claims "the military judge's departure from impartiality violated appellant's constitutional right to due process." As evidence of the military judge's alleged lack of impartiality, appellant identifies three categories of acts by the military judge: (1) interactions with trial defense counsel; (2) prioritization of expediting the completion of the court-martial; and (3) unfavorable, biased rulings. Having reviewed the record, we do not question the court-martial's legality, fairness, and impartiality, taken as a whole. Nonetheless, we will address each category alleged by appellant.

"An accused has a constitutional right to an impartial judge." *United States v. Tapp*, 85 M.J. 19, 27 (C.A.A.F. 2024) (internal citation and quotations omitted). "When a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *Id.* (internal citations, quotations, and alterations omitted). There exists a "strong presumption that a judge is impartial," therefore, to prove judicial bias, a party "must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (internal citation omitted).

This Court applies "an objective standard for identifying an appearance of bias by asking whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (internal citation omitted).

The Supreme Court has stated:

*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within

the bounds of what imperfect men and women, even . . . judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (emphasis in original).

### 1. Interactions with Counsel

There were multiple occasions where the military judge was short-tempered and critical of defense counsel, particularly during the cross-examination of ██ The military judge's ruffled decorum, however, does not constitute an abandonment of his judicial impartiality.

One notable interaction between defense counsel and the military judge occurred after ██ testified that she had not initially reported to law enforcement several of appellant's alleged assaults. Defense counsel then pressed ██ about an incident wherein she allegedly threw a laptop at appellant. After ██ confirmed that law enforcement had investigated the "laptop" incident, defense counsel posed the following question: "[a]nd they ended up *finding* that you were actually the abuser in that situation[?]" (emphasis added). The government objected, citing Military Rules of Evidence [Mil. R. Evid.] 401, 403, and 608(b). In response, defense counsel stated, in the panel members' presence, the following:

> So, Your Honor, as far as 401 and 403—want me to do this now, Your Honor? I mean, so it's the defense's position that there is a tumultuous—that there is a custody dispute here, that she's been titled and found to be an abuser. It would certainly enhance her position now---

The military judge interrupted, stopped the defense counsel from providing further explanation, and excused the panel members. During the following Article 39(a) session, the military judge chastised defense counsel for attempting to "smuggl[e] in extrinsic evidence" by using the term "finding" in front of the panel members.

Further questioning of defense counsel by the military judge revealed a judge advocate had rendered a probable cause determination that ██ had committed the offense of assault, in violation of the United States Code. After ruminating whether defense counsel appreciated the distinction between a probable cause determination and a "finding," which, the military judge stated, implied the existence of some adjudicatory process and deliberative outcome, the military judge questioned whether counsel sufficiently prepared their case to avoid "misleading terms."

Ultimately, the panel members were recalled, and defense counsel was allowed to continue their cross-examination of ███.[3]

After ███ testified, the government continued its case. When the court recessed the following evening, the military judge instructed the panel members to return at 0800 hours the next day. Sensing the end of the government case, the military judge instructed the parties to be prepared to resume trial at 0800 hours the next morning. Despite this instruction, the panel members were not called until after 1000 hours due to a lengthy Article 39(a) session centered on several newly marked Prosecution Exhibits. Prior to calling the members, the military judge admonished both parties:

> [T]his court is extremely frustrated that I could not call the panel members in at 0800, as this court had promised I would do, when I spoke to them last. I directed my comments to the counsel for both sides, not one side or the other, because I had asked the parties to work together . . . . That did not happen. This court let the parties know how frustrated the court was with the defiance to this court's order. And I hold all parties, all counsel, responsible for defying that order. Not one side or the other. Not one attorney singled out from the others . . . .

> I think I probably frustrated, maybe, one attorney more than others. I didn't intend to. My frustration was with both counsel [*sic*]. In the ordinary course of trial, when we call court to order, when we assembled the panel, you . . . should be done with trial preparation. There have been more documents pre-marked as exhibits since this trial started, then were pre-marked at the start of this trial. And it's becoming incredibly frustrating to keep having more documents introduced, and late discovery, and constant reshuffling of the evidence, and reorganization of materials. You are affecting the fact finder's ability to hear the evidence in an undisrupted manner. We've taken more breaks and recesses than we've been on the record, and that's not how we conduct trials in the United States Army. You are military officers. So not only were you given an order from the Court, you were given an order from a superior commissioned officer. I'm not saying you disobeyed my order, but you certainly defied the Court's order . . .

The military judge then called the panel members, apologized for the late start, and asked they "draw no adverse inference" from the delay.

---

[3] The entire Article 39(a) session, in which the government never spoke, lasted approximately thirteen minutes.

While the military judge was often intemperate with defense counsel, as outlined above, and on other occasions, we find his comments were insufficient to render a finding of any bias or prejudice against appellant. *Compare Liteky*, 510 U.S. at 555-56 ("judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . . expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality) *with United States v. Leahr*, 73 M.J. 364, 365 n.1 (C.A.A.F. 2014) (the military judge "twice suggest[ing] . . . appellant was guilty" in front of the members was insufficient to establish "deep-seated favoritism or antagonism"). Nothing about the military judge's conduct evidences any sort of deep-seated prejudice biasing him against appellant. Nor do we find "a reasonable person knowing all the circumstances" would question the military judge's impartiality. *Sullivan*, 74 M.J. at 453.

Indeed, the military judge's anger was not limited to defense counsel. Government counsel drew caustic and snide remarks from the military judge over many of the same issues. Additionally, many of the military judge's admonishments and criticisms, directed towards both parties, centered on delays in the court-martial caused by the conduct of counsel, which the military judge believed could "affect the fact finders' ability to hear the evidence in an undisrupted manner." Not only did these admonishments turn on the administration of the court-martial, to which we provide great deference and flexibility to the military judge, but they typically occurred outside the presence of the panel. *Liteky*, 510 U.S. at 555-56.

More importantly, we do not find, as appellant argues, the military judge abdicated his responsibility of remaining impartial in favor of serving as an advocate for the prosecution. *Cf. United States v. Burton*, 52 M.J. 223, 224-26 (C.A.A.F. 2000) (finding no apparent bias despite the military judge's extensive questioning of the non-commissioned officer appellant, who worked in the brig, during pre-sentencing about punishments for similar offenses he had seen junior Marines receive).

Throughout the trial, the military judge regularly challenged both parties on their basis for evidentiary objections and the admissibility of evidence. While doing so sometimes placed the military judge in the position of clarifying what theory of admissibility the proponent was asserting, or in modifying prior rulings, our superior court has tasked military judges with doing more than "simply [serving as] an umpire in a contest between the Government and the accused." *Quintanilla*, 56 M.J. at 43 (internal citation and quotations omitted). Rather, "the judge's role is to screen all evidence for minimum standards of admissibility and to let the factfinder determine which evidence is more persuasive." *United States v. Kaspers*, 47 M.J. 176, 178 (C.A.A.F. 1997) (internal citation omitted).

*2. Expediency*

Appellant testified in his own defense. After appellant's direct examination, a brief recess ensued. Prior to releasing the panel members for this recess, the military judge stated:

> [H]cre's a conccrn I need to let the court be aware of . . . . I'm not stationed here in Korea. I'm stationed at Joint Base Lewis-McChord and I currently have a flight scheduled for 0930 on Sunday morning. So, we have tonight [Friday] and tomorrow [Saturday], essentially. As I understand it, I need to catch a shuttle here at 0630 on Sunday morning . . . . So, that's the latest I can be here. So, I don't want to rush anybody. I don't want to create any concerns. The counsel know this. I just want to make you aware of that.[4]

Following the recess, the court-martial continued with the cross-examination and redirect of appellant. The following morning (Saturday), counsel for both sides provided closing arguments, and the military judge provided finding instructions. The panel members then deliberated for over four hours before returning mixed findings, including a finding of guilty to a lesser included offense[5] and a finding of guilty by exceptions and substitutions to another offense.[6]

The panel members returned their findings at approximately 1900 hours on Saturday.[7] Appellant then elected to be sentenced by the panel members. When discussing whether to start the pre-sentencing proceedings Saturday evening, the panel president initially requested to continue with the case. However, after an

---

[4] At this point, it was already well into the night on Friday evening—the cross-examination of appellant did not begin until approximately 2023 hours. The court-martial continued with the defense case-in-chief and government rebuttal case. Both parties concluded the presentation of evidence at approximately 2313 hours on Friday evening. The panel members were then excused. The panel members were next recalled at 1009 hours the following day (Saturday).

[5] Assault (with an unloaded firearm) vice aggravated assault with a dangerous weapon (loaded firearm).

[6] Replacing the date "1 October 2017" in one specification and replacing it with "1 September 2017".

[7] The members initially returned at 1905 hours, however, were returned to the deliberation room by the military judge twice to ensure the findings worksheet was properly executed. The announcement of the findings occurred at approximately 1928 hours.

Article 39(a) session, the military judge proposed proceeding with the government sentencing case and then recessing for the evening. The panel president, in response, suggested a recess until the following morning (Sunday) prior to either party proceeding. The military judge adopted this suggestion. Prior to recessing on Saturday evening, the military judge then informed the panel members that his flight back to the United States was adjusted to "another day to accommodate" completion of the trial.

Although we find the military judge's decision to inform the panel members, during the findings phase of the trial, of his pending travel plans approximately thirty-six hours in the future was ill-advised, we do not find doing so placed any pressure on the panel members or impacted appellant's court-martial.[8] In other words, we do not find it affected the panel member's ability to fairly and comprehensively hear and review the evidence put forth by both sides. We base this determination on multiple data points.

The panel deliberated for over four hours, at the conclusion of a lengthy, five-day trial, and returned findings reflective of a highly informed and nuanced understanding of the case. Out of twelve charged acts, the panel found appellant not guilty of five acts, guilty of five others, guilty of a lesser included offense for one, and guilty by exceptions and substitutions for the last.

Based off our review of the record, we appreciate the attention to detail and emphasis the panel placed on only finding appellant guilty of those charges they believed were supported by evidence beyond a reasonable doubt. We discern no evidence and are unpersuaded that the panel members felt rushed or pressured into swiftly proceeding through the court-martial or returning a verdict merely to accommodate the military judge's travel arrangements.[9]

*3. Bias in Evidentiary Rulings*

Lastly, appellant points to many of the military judge's evidentiary rulings as evidence of his bias. While we find error with *some* of the military judge's rulings, as discussed *infra*, we do not find those rulings were the product, or evidence of, bias. *See Quintanilla*, 56 M.J. at 43 ("Actions taken in the course of a trial may

---

[8] We are hard pressed to think of a scenario, absent a disability or family emergency, where a military judge relaying his future travel plans to panel members, in the middle of an ongoing court-martial, is a recommended course of action. Once a court-martial is assembled, a military judge, absent narrow exceptions ("because of disability or otherwise"), is detailed to the case. *See* UCMJ art. 29(e).

[9] As to the pre-sentencing phase, the military judge informed the panel members he had successfully changed his flights to a later date.

warrant disqualification where it can be shown that such bias was either directed against a party or its counsel" (internal citations and quotations omitted)). We also reject appellant's contention that the military judge served as a rubber stamp for the government, while creating an impenetrable obstacle for his own counsel. Instead, we note the military judge, when confronted with complicated evidentiary issues, regularly excused the members, conducted lengthy Article 39(a) sessions with counsel, and challenged both parties appropriately.

Having determined the military judge was impartial regarding his rulings, we now turn to their legal accuracy, particularly those involving the cross-examination of MH.

### B. Evidentiary Rulings

"On appeal, we review a military judge's decision to admit evidence for an abuse of discretion." *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013) (citing United *States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)). Similarly, challenges to restrictions on the cross-examination of a witness is reviewed for an abuse of discretion. *United States v. Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005) ("A defendant's Sixth Amendment right to confront the witnesses against him is violated where . . . a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry." (internal citations omitted)). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *Freeman*, 65 M.J. at 453. "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *Id.* (internal citation and quotations omitted). "[A]ppellant has the burden of showing that a reasonable jury might have reached a significantly different impression of the witness's credibility if the defense counsel had been able to pursue the proposed line of cross-examination." *United States v Moss*, 63 M.J. 233, 236 (C.A.A.F. 2006) (citing *Del. v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

Although one error on its own may be insufficient to find prejudice, this court can also consider the aggregate impact of multiple errors. *E.g. United States v. Dollente*, 45 M.J. 234, 242-43 (C.A.A.F. 1996). In assessing for cumulative error, we:

> consider[] each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy-or lack of efficacy--of any remedial efforts); and the strength of the government's case. The run of the trial

9

may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Id.* (second alteration in original).

### *1. Cross-Examination of* ███

Defense counsel frequently attempted to cross-examine ███ regarding her acts without laying a sufficient foundation as to when the act occurred or how it created a motive for her to fabricate allegations against appellant. The factual basis, relevance, and legal theory of admissibility for several defense questions were not readily apparent. This resulted in the government counsel lodging numerous objections. The military judge held multiple Article 39(a) sessions, outside the panel's presence, to ascertain the factual basis, relevance, and legal theory of admissibility of the defense's questions.

During these Article 39(a) sessions, defense counsel frequently did not provide sufficient clarification regarding the factual basis, relevance, or legal theory of admissibility for the testimony they sought to elicit. Their lack of clarification clouded the issue, resulted in the military judge ruling against them, and it frequently generated further discussion between the military judge and defense counsel. During these further discussions, defense counsel attempted to provide additional information as to their factual basis, relevance, or theory of admissibility and how that related to whether an assault occurred, appellant possessed a possible defense, or MH possessed memory, perception, bias, or motive to fabricate issues.

Despite the military judge ruling against defense regarding some of their questions, the defense was still able to elicit their theory that appellant never abused ███ and she possessed perception and memory issues, bias, and a motive to fabricate throughout her cross-examination, as described below.[10] ███ s defense-favorable testimony allowed defense counsel to argue in their closing that she admitted "again and again and again . . . she hit [appellant] and then she made [the abuse allegations] up so that she wouldn't feel bad about hitting him," that "[appellant] never laid hands on [her]," that she did not allege abuse in her divorce proceedings from appellant, and that "there's this whole thing with [███'s] emotional instability and questions just left unanswered" by the government.

---

[10] Defense counsel could have done a better job articulating, at some junctures, the factual basis, relevance, overall probative value, and theory of admissibility regarding their cross-examination questions, but after reviewing ███'s entire cross-examination, we find counsel effectively elicited defense favorable testimony from ███ regarding her perception, memory, bias, and motive to fabricate. Having found defense counsel's cross-examination was effective, we need not consider whether a claim of ineffective assistance of counsel exists.

We have the luxury of reviewing the written transcript and piecing together the context of defense's arguments and theories. In doing so, we find the military judge did not abuse his discretion on the bulk of his rulings regarding the cross-examination of ██. Even where the military judge erred, as discussed below, we find appellant has not met his burden to demonstrate the panel members would have reached a significantly different impression of ██'s credibility.

The two subject matter areas where the military judge erred in limiting defense questions involved ██s child custody dispute with appellant and her alleged acts of self-harm. After discussing the military judge's rulings on these areas below, we highlight the defense-favorable testimony derived during ██'s cross-examination on these topics (among many others) which aids our conclusion that appellant has failed to establish the panel members would have reached a significantly different impression of ██'s credibility if defense counsel could have asked the questions the military judge denied.

### 2. Custody Dispute

As discussed earlier, defense counsel attempted to elicit evidence of ██'s abusive behavior towards appellant during their time in the ROK, particularly throwing a laptop at him (with no reference to when that occurred). Following a government objection, defense asserted as a basis for their question, with the panel members present, that there was a custody dispute and ██ had been titled and "found to be an abuser." The military judge then dismissed the panel members and discussed the factual predicate for the defense line of questioning.

Defense counsel asserted the "finding" of abuse was relevant evidence of ██s bias and motive to fabricate, as she had been engaged in a custody dispute with appellant at the time she agreed to participate in his court-martial. As part of his ruling, the military judge cited to Mil. R. Evid. 403 concerns stating the "issue at hand is whether or not there was an assault. I don't know how that has anything to do with a custody dispute." Defense counsel asserted he was attempting to elicit ██'s motive to fabricate.[11]

The overall context and reasoning of the military judge's Mil. R. Evid. 403 ruling regarding the custody dispute is faulty. The relevance was the pendency of the dispute when ██ agreed to participate in the court-martial, and to what extent, if any, it impacted ██'s testimony at trial. While ██ seemingly disavowed any impact by asserting appellant had rejected paternity of her child, the alleged claim of bias was proper for the panel members to weigh and evaluate, especially when

---

[11] As to a possible custody dispute, defense counsel later in the cross-examination questioned ██ regarding the pending "family court action." She testified she never alleged domestic violence in those proceedings.

assessing her credibility. As such, the military judge erred in his reasoning and in limiting the defense cross-examination regarding a possible custody dispute at this juncture of the cross-examination. However, given defense counsel ultimately did confront ███ about her "family court action," we find appellant was not prejudiced by the military judge's mistake.

### 3. MH's Self-Harming

Early in ███'s cross-examination, defense counsel directed ███ to an incident where the military police had come to her and appellant's home in August for a welfare check and found her locked in a bathroom with a knife. Counsel then asked: "And you had cut yourself at the time?" After the government objected under Mil. R. Evid. 401 and 403, defense counsel asserted this event was "one of the charged conducts," and the military judge excused the panel. The government asserted the "welfare check" in August that defense was discussing did not occur contemporaneously with the August assault alleged on the charge sheet so it was not relevant.

As opposed to clarifying the date of the "welfare check" in August, defense asserted ███'s conduct was "indicative of a pattern" in her relationship with appellant. Defense argued:

> every time that she's talking about—or she makes an allegation that there was domestic violence, she's actually self-harming *at the time*
>
> . . . . And then when the [military police] . . . arrive, she then makes this . . . outcry to the police or to the command and then later rescinds it and says essentially she was having this episode and it's untrue.

(emphasis added).

We deduce the essence of the defense theory was ███ was harming herself during the marriage and initially lied, blaming appellant, to avoid taking onus for her "episodes." ███'s subsequent recantations then supported the defense theory that appellant did not assault ███, her allegations were false, and she possessed issues with her "perception, memory, or bias."

The military judge ruled he would allow defense counsel to lay a foundation establishing a specific incident of self-harm "on a specific date[,] as a specific response," and "a nexus between that and an allegation on the charge sheet." Without a direct nexus, the military judge was concerned any evidence of self-harm was nothing more than "impermissible character evidence," i.e., extrinsic acts to "articulate [███'s] behavior." Defense counsel ultimately moved on from this line of questioning.

We agree with the military judge that defense counsel failed to establish how acts of self-harm, without any context as to *when* those allegedly occurred, impacted ████'s perception or memory as it related to a charged assault. However, the military judge did not consider that specific instances of self-harm and ████'s subsequent recantations could serve as evidence probative of her character for truthfulness under Mil. R. Evid. 608(b), or her bias and motive to fabricate under Mil. R. Evid. 608(c).[12] Although we find the military judge's reasoning faulty regarding the possible application of these two rules of evidence, the defense counsel did not invoke either rule directly, nor did they fully articulate the relevance of their proffered questions. At this point of the trial, whether the military judge erred or the defense counsel failed to sufficiently articulate their theory of admissibility, is ultimately moot as discussed below.

After an Article 39(a) session, ████ testified during cross-examination that her alleged recantations all related to her abuse at the hands of appellant, as opposed to her acts of self-harm. After this concession, any alleged acts of self-harm by ████ possessed low, if any, probative value as to her truthfulness, bias, or motive to fabricate and, even assuming arguendo the military judge erred in limiting cross-examination in this area, there was no prejudice to defense.

████ During an additional Article 39(a) session, defense counsel attempted to assert ████ was harming herself, resulting in her incurring an injury. The military judge rejected this theory of admissibility as possessing no relevance because the government had admitted no evidence ████ had received any injury from appellant. Defense counsel then changed his theory of admissibility to "an alternate source of the confrontation." Although never fully articulated, it appears defense was attempting to establish appellant pulled ████'s hair as a possible attempt to stop her from harming herself or harming him (*i.e.*, defense of others or self-defense).[13]

The military judge stated "[y]ou're trying to introduce an alternate theory to what happened that day. That's completely different, and that's not a valid cross-examination." Though counsel claimed the military judge's ruling had the effect of

---

[12] Under Mil. R. Evid. 608(b), "extrinsic evidence is [generally] not admissible to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness." Mil. R. Evid. 608(c), however, allows for evidence of "Bias, prejudice, or any motive to misrepresent [to] be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced."

[13] Ultimately, self-defense was not an applicable defense theory of the case, as appellant testified during his case-in-chief that most of the assaults alleged by ████ had never occurred – either she made them up or had abused him. More importantly, appellant did not clearly testify as to any act of self-defense regarding himself or another applying to any of the charged assaults regarding ████

"essentially forcing [appellant] to take the stand," the military judge later emphasized he was "not trying to limit [counsel's] cross-examination," merely it "ha[d] to be limited to crossing ██ about questions she was asked in direct examination" versus "lay[ing] out testimony."

As a general proposition, the military judge's overbroad statement, limiting cross-examination questions to those asked on direct examination, is erroneous. Certainly, the defense can ask questions to establish an alternative set of facts occurred on the date of a charged offense. However, an alternative version for a charged assault was not what defense articulated when explaining the relevance of the event. Instead, defense sought to introduce a "pattern of self-harm" and this "pattern," not tied to any specification, had limited probative value, if any, as to an "alternate source of confrontation" for a charged assault.

Having discussed the military judge's evidentiary rulings, we analyzed if limiting any of defense's cross examination questions was prejudicial to appellant. It was not.

### 4. Defense Favorable Testimony Elicited During ██'s Cross-Examination

During her cross-examination, ██ agreed with defense counsel that (1) she had spoken with appellant's chain of command and recanted her allegations; (2) she had said she made it up; (3) she had said voices in her head told her to make the allegations against appellant; (4) she had said a shadow man made her do it; and (5) this shadow man would harm her unborn baby if she did not raise the allegation. The defense counsel was allowed, over government objection, to ask ██ if she was taking medication for depression. ██ responded "yes" and agreed with defense counsel that she stopped taking her medicine once she arrived in the ROK. ██'s admissions served to greatly enhance the defense theory that she was untruthful and possessed perception problems.

Along with attacking ██'s truthfulness and perception, defense also challenged the veracity of her allegations based on her relationship with OT, appellant's first wife. ██ and ██ began communicating shortly after ██'s marriage to appellant. ██ reached out "because [she] felt like [she] was trapped." During an exchange over Facebook Messenger, without ██ first informing ██ of any violence at the hands of appellant, ██ informed ██ if she made an allegation of abuse to appellant's command, she could receive services. Because of the temporal relationship between when ██ learned of the ability to receive services, relative to when she reported appellant's domestic abuse, defense counsel was able to argue ██'s allegations were fabricated to secure material benefits and leave the ROK.

Furthermore, when ██ ultimately reported her allegations to law enforcement in August 2019, defense elicited that she failed to disclose four of the five charged

assaults: the knee to her stomach, being sprayed with Febreeze, being hit in her face, or being pulled by her ear. Defense counsel cross-examined ██ extensively on this point, highlighting that law enforcement had investigated the allegations she proffered in August 2019 and found they lacked merit.

Defense counsel then confronted ██ with Facebook messages exchanged between her and appellant in September 2019. ██ acknowledged stating to appellant in these messages the following: "You shouldn't be in trouble. I should"; "I didn't want to lie. I wanted them to know I was abusing you and making stuff up"; "That's the truth. I have a mental disease. I make stuff up to help me even . . . when it [*sic*] puts my hands on you"; "I'll take a polygraph. You've never hurt me"; "I made that up. You're not abusive"; "You've never hurt me. Never done anything to me"; and "So now you're going to get in trouble for the lies that I said. I said that they were lies." We view this part of ██'s cross-examination as also strongly supporting a defense theory that she was a liar with perception problems.

Based on their successful cross-examination, defense counsel vehemently attacked ██'s credibility and reliability during their closing argument. Counsel asserted, among other themes, that: (1) ██ and ██, were "vindictive and angry ex-wives," who colluded to lodge false allegations against appellant; (2) ██ possessed perception and memory issues causing her to lie and later recant her allegations; (3) ██'s text messages to appellant proved she, not him, committed spousal abuse; (4) ██ provided no physical evidence substantiating her abuse; and (5) ██ lied to get "a leg up in a custody battle" involving their child.

Even though the military judge limited the defense on questions concerning self-harm, appellant's extensive cross-examination of ██ attacked her perception, memory, bias, and truthfulness in front of the panel members, satisfying the requirements of the Sixth Amendment. *E.g.*, *United States v. Longstreath*, 45 M.J. 366, 374 (C.A.A.F. 1996) (noting the right to an effective cross-examination does not extend to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985))).

### C. Other Rulings[14]

*1. █Report to Sexual Harassment/Assault Response and Prevention (SHARP)*

Appellant argues the military judge erred in allowing the government to offer evidence during █s redirect examination regarding why she initially reported appellant's misconduct via the Army's SHARP program. We disagree.

During█'s cross examination, she affirmed she reported her abuse "as a SHARP allegation" during her initial entry training. The government then notified the court of their intent to flesh out the nature of the report to limit collateral attacks to█'s credibility (i.e., that she had made a report of sexual assault that was uncorroborated and, therefore, not charged). The military judge allowed the government to inquire as to the circumstances of how and when █made her report as defense had opened the door to such testimony. █ultimately testified her relationship with appellant had included acts of sexual violence, it was SHARP training that made her appreciate the seriousness of appellant's misconduct, and it was her desire for those allegations to be tried at a court-martial.

This was not error. The government is not precluded from "walking through the door already opened by the defense," especially when preventing it from doing so "would have left the members with a skewed view of the evidence." *United States v. Martin*, 75 M.J. 321, 327 (C.A.A.F. 2016) (internal citation omitted). Though defense counsel's examination of █regarding her SHARP report was limited, the military judge properly allowed the government to respond to this issue as the defense had opened the door to its relevance.

---

[14] In addition to the rulings discussed in this section, appellant also argues the military judge erred in assessing whether certain communications made by MH to a Family Advocacy Program (FAP) provider were privileged under Mil. R. Evid. 513. In finding the military judge did not err, we note appellant acknowledged "[i]n a rambling Article 39(a) session, trial counsel raised the specter of privileged communications." Once the possibility of the existence of a privilege was invoked, the military judge was obligated to inquire further. See Mil. R. Evid. 513(e). While the military judge's questioning regarding this issue erroneously implied the burden lay on defense to establish whether any communications were privileged, *see United States v. Harpole*, 77 M.J. 231, 235 (C.A.A.F. 2018) ("The party claiming the privilege has the burden of establishing by a preponderance of the evidence that the communication is privileged."), the defense counsel ultimately did not seek to elicit evidence protected by the privilege. As such, the military judge allowed defense counsel's questioning to continue and the issue was mooted.

### 2. *Messages Between Appellant and his Mother*

Lastly, we consider whether the military judge erred in preventing appellant from admitting, as a prior consistent statement, a December 2018 text message to his mother.[15] In this message, appellant portrayed ██ as an abuser by alleging she brandished a knife at him. Appellant told his mother ██ "wouldn't let me leave the house by trapping me in a room saying if you want a divorce one of us needs to die. Then [she] pulled a . . . knife on me." This brief message contained no assertion by appellant that he committed any act of self-defense against ██ as a response to her alleged aggression.

A prior consistent statement may only be admitted for the truth of the matter asserted if it "is consistent with the declarant's testimony and is offered[] to rebut an express or implied charge that the declarant recently fabricated it." Mil. R. Evid. 801(d)(1)(B)(i). "[T]he prior statement . . . must precede any motive to fabricate . . . and . . . where multiple motives to fabricate . . . are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *United States v. Frost*, 79 M.J. 104, 110 (C.A.A.F. 2019) (internal citations omitted). To be admitted, "(1) the declarant of the out-of-court statement must testify, (2) the declarant must be subject to cross-examination about the prior statement, and (3) the statement must be consistent with the declarant's testimony." *United States v. Finch*, 79 M.J. 389, 394-95 (C.A.A.F. 2020) (citing Mil. R. Evid. 801(d)(1)(B)).[16]

In analyzing the admissibility of appellant's December 2018 message, we must first review his cross-examination. Government counsel cross-examined appellant about messages between him and ██ where he had the opportunity to assert he committed certain acts against her in self-defense. He failed to do so. These messages occurred in May and July 2018. As these messages occurred months before December 2018, the military judge correctly determined appellant's message to his mother did not serve as a *prior* statement to his conversations with ██ in May and July 2018.

Arguably, the government asked limited cross-examination questions challenging appellant on whether he fabricated his in-court testimony regarding ██ and self-defense. This moved the timeline; making any pre-trial statement by appellant, including the December 2018 message, a *prior* statement to his in-court testimony.

---

[15] Government appellate counsel does not contest this assertion of error. We are not bound by concessions made by counsel.

[16] There is no question the first two prongs of Mil. R. Evid. 801(d)(1)(B) were satisfied.

Defense counsel contended, "the government's position has been, [appellant] had every opportunity to assert self-defense. [He] never did it. And now, by inference, they're saying now [he came] here to this court and [he is now only] saying this, essentially implying a recent fabrication" by appellant occurred at trial. Although the military judge failed to rule on this theory of admissibility, we determine appellant's December 2018 message was not admissible as a prior *consistent* statement because it contained nothing indicating whether appellant acted in self-defense. Therefore, the government's attack on appellant's in-court testimony regarding ██ and self-defense was not of the same nature as the contents of his December 2018 message in which he only alleged ██ was an abuser. *See id.* at 395.

### D. Cumulative Error

We do not find the doctrine of cumulative error provides relief for appellant. As discussed *supra*, the military judge did not abuse his discretion in most of his rulings. Regarding those rulings we did find erroneous, we do not find the sum of those errors warrant relief. The few errors that occurred were sparsely littered throughout appellant's six-day trial. *See Dollente*, 45 M.J. at 242. As such, we find they had a minimal compounding effect, taken in their entirety, and the panel would not have reached a significantly different impression of ██'s credibility.

## CONCLUSION

Upon consideration of the entire record, Specifications 2 and 3 of Charge I[17] are merged into a consolidated specification, numbered as Specification 2 of Charge I, to read as follows:

> In that [appellant], U.S. Army, did, at or near Fayetteville, North Carolina, between on or about 1 September 2017 and on or about 30 December 2017, unlawfully strike Specialist ██ on the thigh and on the mouth with his fist.

The finding of guilty to Specification 2 of Charge I, as consolidated, and Charge I is AFFIRMED. The finding of guilty to Specification 3 of Charge I is SET

---

[17] In these specifications, appellant was found guilty of striking ██ on the thigh with his fist and with striking her mouth with his fist. These assaults occurred during the same confrontation and constituted "an uninterrupted attack comprising touchings united in time, circumstance, and impulse." *United States v. Clarke*, 74 M.J. 627, 628 (Army Ct. Crim. App. 2015) (internal quotations and citations omitted). As such, they are multiplicious and must be merged. *See United States v. Malone*, __ M.J. __, 2025 CCA LEXIS 75, at *23-26, 28-29 (Army Ct. Crim. App. 25 Feb. 2025).

ASIDE and DISMISSED. The remaining findings of guilty and the sentence are AFFIRMED.[18]

Judge COOPER and Judge SCHLACK concur.

FOR THE COURT:



JAMES W. HERRING, JR.
Clerk of Court

---

[18] Given our consolidation of specifications, we must determine whether our "broad discretion" allows us to reassess appellant's sentence versus ordering a rehearing. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Based on our experiences as judges on this court, we are confident, even with a consolidated specification, that the panel would have sentenced appellant to at least a dishonorable discharge, confinement for three years, and reduction to the grade of E-1.